IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>NELLY IDOWU,<br><br>　　　　　　Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL<br><br><br>Case No. 2:20-CR-284 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant's Motion for Judgment of Acquittal. Following the conclusion of the government's presentation of the evidence in its case-in-chief, on October 19, 2023, Defendant orally moved for a judgment of acquittal on all counts under Fed. R. Crim. P. 29(a). The Court denied Defendant's Motion but indicated it would provide its basis for doing so in a written order. The Court denied the Motion for the reasons described herein.

I. STANDARD

Fed. R. of Crim. P. 29(a) provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In considering a sufficiency of the evidence challenge, the Court must "review the evidence and its reasonable inferences in the light most favorable to the government" and "determine whether a reasonable

1

jury could find the defendant guilty beyond a reasonable doubt."[1] The Court must not "weigh conflicting evidence or consider witness credibility."[2]

## II. BACKGROUND

Defendant is charged with three Counts. Count 1 charges Defendant with Conspiracy in violation of 18 U.S.C. § 1956(h). Counts 6 and 8 charge Defendant with Money Laundering in violation of 18 U.S.C. § 1957. In relation to Counts 6 and 8, the government has also charged Defendant with Aiding and Abetting in violation of 18 U.S.C. § 2(a).[3]

The following evidence was presented at trial in the government's case-in-chief against Defendant.[4] First, the government presented testimony from Officer Paul Shade, a police officer in Utah County. Officer Shade testified that in August 2018 he received a report from California involving a fraudulent check that was deposited into a Utah-based Wells Fargo account in Nelly Idowu's name. He testified that as a result of his investigation, he spoke with Defendant who was in Texas in October 2018. Defendant told him that she knew the account was closed due to fraudulent activity but had no knowledge of a person in California or any involvement there.

The government presented testimony from witnesses R.G., V.G., J.F., and L.P., who were all victims of "romance scams" at various times between 2017 and 2019. R.G. testified that upon setting up a profile on a dating website, she was contacted by and began communicating online and via text message and phone calls with a man who identified himself as Josh Marco Ruiz.

---

[1] *United States v. Ramos-Arenas*, 596 F.3d 783, 786 (10th Cir. 2010) (citing *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009)).

[2] *Id.* (quoting *United States v. Castorena-Jaime*, 285 F.3d 916, 933 (10th Cir. 2002)).

[3] The government did not proceed under an aiding and abetting theory at trial and as such the Court will not address the elements required under 18 U.S.C. § 2(a).

[4] The below summary is not a complete accounting of the evidence presented by the government, but is instead a summary of the evidence presented that is relevant to this Motion.

After some time, Ruiz asked R.G. to send him money to set up a business and told her to send $300,000 to "Roxy Multiservices LLC" in March 2019. R.G. testified that she sent the money, but $245,135 was returned to her.

V.G. testified that in 2017, she began messaging a man who identified himself as "George Slaten" on Facebook and engaged in a relationship with him via phone calls and text messages. V.G. testified that some time after initiating the conversation, Slaten began asking her to send him money for various repairs to his oil rig and directed her to send the money to Wells Fargo accounts in the name of Nelly Idowu, which she did on nine separate occasions from August 2017 to January 2018. The government presented evidence that showed deposits from V.G. in Defendant's accounts during that time. V.G. also testified that Slaten directed her to send money to accounts in the names of Emmanuel Adesotu and Julius Frederick, which she did.

J.F. testified that in 2018 he began communicating with a woman named "Elena Lasik" via various social media platforms and cultivated a relationship with her. J.F. testified that in 2019, Lasik told him she needed money after being injured abroad and asked him to send money to an account in the name of Roxy Multiservices, after which he deposited $20,000 into the account.

L.P. testified that she met a man identifying himself as "Brent Jason Chandler" in 2019 on a dating website before cultivating a relationship via phone. L.P. testified that a few months into the relationship, Chandler asked her for money to get items out of customs. L.P. testified that Chandler told her to send a cashier's check to a bank account in the name of Kelly Andrew in Orem, Utah. L.P. further testified that she sent a check for $21,200 to that account in May 2019.

The government presented testimony from FBI Agent John Coyle. Agent Coyle testified that he interviewed Defendant as part of an investigation into an illegal financial scheme involving a romance scam as directed by the Salt Lake field office. The government also presented evidence of a video recording and transcript of the interview. Agent Coyle testified Defendant told him that from June to October 2018 and spring and summer 2019, she lived in Texas with her brother's wife, Yemisi Wilson-Metus. Agent Coyle testified that while reviewing Defendant's work history, she never mentioned Roxy Multiservices, LLC until he asked her about it. The government presented evidence that Defendant listed the purpose of Roxy Multiservices LLC as "Design Consulting and Planning, Food catering and Corporate/home cleaning" on her business registration.

Agent Coyle testified that Defendant told him she did not cater or clean after starting the business, but she did personal shopping for her brother. Agent Coyle testified that Defendant could not give him any names of clients she had shopped for. The government presented evidence of a deposit into a bank account in the name of Roxy Multiservices LLC for $120,000 from J. S. Agent Coyle testified that Defendant told him that she did not know J. S. and did not know what she did with the money, but was supposed to purchase something. Defendant stated that her brother might have more information.

Agent Coyle testified that he asked Defendant about a deposit for $70,000 from Avion Gallery. Defendant told him that it was to buy watches, but she was not getting paid. Agent Coyle testified that he asked Defendant if she transferred money overseas from Roxy Multiservices accounts, to which Defendant told him yes, it was for construction materials or watches, but did not remember how much she sent. Agent Coyle testified that he asked

Defendant about sending $80,000 from a Roxy Multiservices bank account to China. Defendant told him it was for the purchase of something, but she did not remember what.

Agent Coyle testified that he asked Defendant about a check from Julius Frederick to her for $20,000 in January 2019. Defendant told him that she met Frederick in Utah, and he sent her the money because something happened with his account, and he needed help. Agent Coyle also asked Defendant about a cashier's check from Emmanuel Adesotu written out to Nelly Idowu in the amount of $100,000 in February 2019 and another cashier's check a few days later that she wrote to Godwin Omene for the $76,000. Agent Coyle testified that Defendant stated that she knew the money was not Adesotu's. She told him that she did not know Godwin Omen and she would need to reach out to her brother for more information.

The government presented evidence that Defendant's Brother Emeka Wilson-Metus was incarcerated from June 2017 until February 5, 2020, when he was released from Bureau of Prisons' custody after serving a federal sentence. The government also presented evidence of Western Union accounts of Defendant, her brother's wife, and Kelly Andrew sending money to Wilson-Metus in correctional facilities and to other inmates in those same facilities.

The government presented testimony from FBI Forensic Accountant Angela Mennitt as an expert in forensic accounting involving online scams and bank records. Mennitt testified about her training and experience in investigating financial crimes, including romance scams. Mennitt testified about her investigation which involved fifty bank accounts tied to Defendant and codefendants Julius Frederick, Emmanuel Adesotu, Nnamdi Chukwu and their respective companies Pea Network Companies (Adesotu), NJ Clems (Chukwu), and Roxy Multiservices LLC (Defendant).

Mennitt testified that in 2019, Defendant registered Roxy Multiservices and subsequently opened two bank accounts in the name of the business. She testified that bank records show that during 2019 the accounts received approximately $826,000 less the amount returned to R.G.—the smallest deposit being $4,313.26 in March 2019 and the largest being $300,000 in February 2019. Mennitt also testified about the inflow of deposits into Defendant's personal accounts, Roxy Multiservices accounts, and into accounts in the name of Kelly Andrew or Andrew Kelly. Mennitt testified about the above-mentioned Western Union transactions. Mennitt testified that Chase Bank was insured as a member of the FDIC and an issuer of checks on the dates of the Count 6 and 8 transactions.

The government presented testimony of Emmanuel Adesotu, Defendant's co-defendant. Adesotu testified that he knew Defendant and spent time at her home. He testified that he introduced Defendant to Julius Frederick sometime in 2016. Adesotu testified that in June 2017, he gave Defendant a check in her name for $27,000 after receiving $45,000 from Julius Frederick. He testified that he asked Defendant to transfer the money to Nigeria, which she did. Adesotu testified that Defendant did not ask questions about where the money came from. Adesotu testified that he split a percentage of the money he was moving through his account with Frederick as payment for moving the money.

Adesotu testified that in March 2017, he received a transfer of $3,250 from V.G. in his account. This transfer occurred when he was working with Frederick. Adesotu testified that he began asking Frederick where the money was coming from and eventually concluded that it was scam proceeds. Adesotu testified that he continued to move money through his account, but at some point ceased working with Julius Frederick due to a dispute regarding payment.

Adesotu testified that in October 2018, he formed his business, Pea Network Technology, and opened bank accounts in its name. He testified that in January 2019, Defendant asked him to move one million dollars. Adesotu testified that he went to Defendant's home and spoke with her and her brother before money came into his account. He testified that he gave Defendant his account information but he did not ask where the money was coming from and did not discuss it with Defendant. Adesotu testified that he subsequently received two wire transfers into his Pea Network bank account: $20,000 and $225,000 from J.S. A few days later Adesotu withdrew $100,000 for a cashier's check made out to Nelly Idowu. He testified that Defendant directed him where to transfer the money. The government presented evidence of Adesotu's bank accounts, including the Pea Network Technology account used. The account also showed an $80,000 transfer to Hongkong Youyi Limited at Hang Seng Bank on February 8, 2019.

Finally, the government presented testimony of Nnamdi Chukwu, another co-defendant in the case. Chukwu testified that he moved to Utah in 2018 but knew Defendant and Adesotu before then. He testified that Defendant introduced him to Julius Frederick when he moved to Utah. Chukwu testified that in January 2019, Adesotu asked him to move money through his Chase bank account. The government presented evidence of Chukwu's bank account records that showed a deposit of $8,500 into the account from Adesotu's Pea Network Technology Wells Fargo account on January 17, 2019. The evidence also showed an international wire transfer from Chukwu's bank account to the Pea Network account in Nigeria the next day. The evidence of the account showed and Chukwu testified about other money transferred into his account, including from Julius Frederick, which was later sent to Nigeria. Chukwu also testified that it became apparent to him that the money he was moving was not from legitimate sources.

Chukwu testified about his bank account being closed for suspicion of fraud. He testified that when he told Defendant about it, she told him not to worry and it had happened to her before. Chukwu testified that he created a business, NJ Clems, with help from Defendant. He testified that Defendant told him that business bank accounts can handle more funds if you want to transfer funds. Chukwu testified that Defendant asked him for NJ Clems' bank account information, which he gave to her, after which Defendant told him that her brother would send money to his account. On March 29, 2019, he received a $100,000 deposit from Avion Gallery into his account and Defendant directed him to make a number of transfers, including $20,020 to a Nigerian account, $40,000 to a Chinese account, a $10,000 cashier's check to her brother's wife, and $7,000 into his personal account to purchase clothing for Defendant. The government presented documentary evidence of Chukwu's bank account that supported this testimony. Chukwu testified that he received a $53,000 deposit in June 2019 via cashier's check from K.L., whom he did not know. He testified that Defendant gave him an account number for a bank account in Nigeria and directed him to wire funds to that account. Chukwu testified and bank records evidenced that he subsequently transferred $43,200 to the account.

The parties stipulated that a man identifying as "Brent Jason Chandler" cultivated online relationships with J.S., L.P., K.B, and D.R. and eventually requested that each woman send money through check or wire to one or more of the following accounts: Roxy Multiservices, LLC, Kelly Andrew, Pea Network Technology, NJ Clems and to accounts in China. They also stipulated that Chandler directed J.S. to send $225,000 via interstate wire to Pea Network Technology on February 5, 2019, which she did. The parties stipulated that E.G. similarly met a man identified as Raymond Brando online and at his request sent an $80,000 cashier check by mail to Julius Frederick. Both parties stipulated that the money sent by V.G., R.B., J.M., B.F.,

8

J.F., D.R., J.S., P.D., and K.B. to the defendants was sent because they had been convinced by someone to do so as part of that person's scheme to obtain their money through fraud.

III. DISCUSSION

Defendant argued at the close of the government's case-in-chief that she should be acquitted on all charges because the government failed to present sufficient evidence supporting the charges.

The Court has examined the evidence presented at trial and finds that the government has met its burden to present evidence that could reasonably sustain a conviction as to each of the Counts.

To sustain a conviction for Count 1, Conspiracy to Commit Money Laundering, the government must present sufficient evidence to support that (1) the defendant agreed with at least one other person to violate 18 U.S.C. § 1957 money laundering; (2) the defendant knew the essential objective of the conspiracy; (3) the defendant knowingly and voluntarily participated in the conspiracy; (4) there was interdependence among the members of the conspiracy; that is, the members, in some way or manner intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

Based on the evidence presented by the government described above, the government has presented sufficient evidence to support a conviction for Count 1. First, the following evidence, among other evidence, supports that Defendant agreed with at least one other person to commit money laundering in violation of 18 U.S.C. § 1957: Adesotu's testimony that he agreed to a request from Defendant and her brother to move money through his business account, Pea Network Technology; Adesotu's testimony and documentary evidence presented that two wire transfers for $20,000 and $225,000 from J.S. were deposited in his bank account in the name of

Pea Network Technology after which the Defendant directed him to send $100,000 to Godwin Omene; Adesotu's testimony that he knew the proceeds were scam proceeds; Adesotu's testimony that in June 2017 he asked Defendant to transfer money through her account to Nigeria, to which Defendant agreed and did not ask questions about the its origin; Chukwu's testimony that Defendant asked for his bank account information and informed him that her brother would send money into his account by cashier's check and Defendant directed him on where to transfer the $100,000 after it was deposited in his account, which included international wire transfers to Nigeria and China, and a cashier's check for her brother's wife; Records of Defendant's bank accounts showing large amounts of money deposited and subsequently withdrawn. This element is additionally supported by the evidence discussed below supporting Counts 6 and 8.

 Second, the following evidence, in addition to that discussed above, supports Defendant knew the essential objective of the conspiracy: Adesotu's testimony that Defendant asked him to help her move one million dollars through his bank account; Chukwu's testimony that Defendant helped him register his business and told him that business bank accounts can handle more funds for transferring money or moving money through the account; Chukwu's testimony that he made Defendant aware of when he would work with other members of the conspiracy to transfer money to different accounts within the group.

 Third, in addition to the evidence discussed above, the following evidence supports that Defendant knowingly and voluntarily participated in the conspiracy: Adesotu's testimony that Defendant directed him where to transfer funds coming through his account; Chukwu's testimony that Defendant asked him to move money through his account, got his account information, and then, after money was deposited, gave him direction on where to send the

money; Evidence of Defendant's interview with Agent Coyle in which she stated that she knew the money deposited in her account from Adesotu was not his before she transferred it to Godwin Omene.

Fourth, the following evidence, in addition to the evidence above, supports that there was interdependence among the members of the conspiracy: Adesotu's testimony that he spoke with Defendant before and after money was deposited in his account; Mennitt's testimony and records showing deposits and transactions between the co-defendants and their companies and Defendant and Roxy Multiservices; Adesotu's testimony that he gave Defendant a couple hundred dollars for moving money through her account to a Nigerian account after he transferred $27,000 to an account in Defendant's name; Evidence that Julius Frederick sent a cashier's check to a bank account in Defendant's name for $20,000 on January 3, 2019; Defendant's interview in which she stated that she sent the money because Frederick had problems with his account and needed help; Records of Defendant's bank accounts, showing transfers to her husband after larger sums of money were deposited into her accounts.

Viewed in the light most favorable to the government, the above-discussed evidence is sufficient to support that Defendant engaged in a conspiracy to commit laundering in violation of 18 U.S.C. § 1957. The Court will, therefore, deny the Defendant's Motion as to Count 1.

To sustain a conviction for Count 6, Money Laundering, the government must present sufficient evidence support that on or about January 7, 2019 (1) the defendant knowingly engaged or attempted to engage in a monetary transaction, that is a deposit, withdrawal, transfer, or exchange in or affecting interstate or foreign commerce by, through, or to a financial institution which is a bank insured by the Federal Deposit Insurance Corporation (FDIC) or an issuer, redeemer, or cashier of traveler's checks, checks, money orders, or similar instruments;

(2) the defendant knew the money transaction involved criminally derived property; (3) the property had a value of greater than $10,000; (4) the property was derived from specified unlawful activity: wire fraud, in violation of 18 U.S.C. § 1343. This charge is based on an alleged transfer of $19,500, sent on January 7, 2019, from Defendant's Chase bank account to an account at Hang Seng Bank in China.

The government has presented sufficient evidence to sustain a conviction under Count 6. First, the government presented evidence of Defendant's Chase bank statement showing a transfer sent on January 7, 2019, of $19,500 to Hang Seng Bank. Further, Agent Coyle testified, and the video recording confirmed, that Defendant stated in her interview with Agent Coyle that she sent the January 7 transfer. Additionally, Mennitt testified that the bank was FDIC insured.

Second, to show that Defendant knew the funds she transferred were derived from criminal activity, as detailed in the Court's October 23, 2023 order, the government may present evidence of actual knowledge or of deliberate ignorance of the operative facts.[5] The following evidence, along with the evidence detailed in the Court's prior order, supports a reasonable inference that Defendant knew the funds she transferred were derived from criminal activity: Agent Coyle's testimony and Defendant's interview wherein she stated that did not know for what purpose the money was being used; Evidence of Defendant's bank accounts that on January 3, 2019, Defendant deposited a cashier's check from Julius Frederick for $20,000 into her Chase bank account; Adesotu's testimony that he knew the money from Frederick were scam proceeds; Testimony of both Adesotu and Chukwu that Defendant moved large amounts money through their accounts, including a transfer to the same Hang Seng Bank account, and directed them where to transfer the money once received.

---

[5] Docket No. 261.

Third, the above-described evidence showing that $19,500 was wired from Defendant's account is sufficient to support that the property at issue has a value greater than $10,000.

To support the fourth element, the government must present some evidence that the property was derived from wire fraud, in violation of 18 U.S.C. § 1343. The government must therefore prove beyond a reasonable doubt the following: (1) a person devised or intended a scheme to defraud; (2) that person acted with specific intent to defraud; (3) that person used interstate or foreign wire communications facilities or caused another person to use interstate or foreign wires communications facilities for the purpose of carrying out the scheme; and (4) the scheme employed false or fraudulent pretenses, representations, or promises that were material.

Mennitt testified that a $20,000 cashier's check made out to Defendant from Julius Frederick was deposited in Defendant's account, after which an international wire transfer of $19,950 was sent from her account to an account in the name of Hongkong Youyi at Hang Seng Bank in Hong Kong. Mennitt further testified that the transfer of $19,950 must have been from the proceeds of the $20,000 deposit from Frederick because there were not sufficient funds in Defendant's account for the withdrawal prior to the deposit.

The government has presented sufficient evidence to sustain the fourth element. First, the parties' stipulated that EG. sent a cashier's check to Julius Frederick in January 2019 at the direction of "Raymond Brando" as part of that person's scheme to obtain her money through fraud. Second, the parties' stipulated that when E.G. sent money to Julius Frederick it was because she had been convinced by "Brando" as part of scheme to obtain money through fraud. Third, the parties' stipulated that "Brando" directed E.G. to mail an $80,000 cashier's check from E.G. to Julius Frederick and E.G. did so. Further, Mennitt testified and presented evidence that Frederick wrote a cashier's check to Defendant from the proceeds of the $80,000, which was

deposited into her account and then sent via international wire to the Hong Kong bank account. Fourth, the parties' stipulated that the person using the "Brando" identify employed fraud to obtain the funds.

Finally, the government presented evidence sufficient to sustain a conviction that the transaction occurred in the United States through Mennitt's testimony to that effect and documentary evidence showing the deposits and withdrawals occurring in the United States.

Based on the evidence outlined above, among other evidence, the Court finds that the government has presented sufficient evidence of each of the requisite elements to sustain a conviction under Count 6.

Finally, to sustain a conviction for Count 8, Money Laundering, the government must present sufficient evidence to support that on or about February 8, 2019 (1) the defendant knowingly engaged or attempted to engage in a monetary transaction; (2) the defendant knew the money transaction involved criminally derived property; (3) the property had a value of greater than $10,000; (4) the property was derived from specified unlawful activity: wire fraud, in violation of 18 U.S.C. § 1343. This charge is based on a $100,000 deposit from Adesotu's account into Defendant's account, after which, on February 8, 2019, a $76,000 cashier's check written out to Godwin Omene was withdraw from Defendant's account.

The government has presented sufficient evidence to sustain a conviction under Count 8. First, the government presented evidence from Agent Coyle's interview in which Defendant stated that she sent $76,000 to Godwin Omene. Further, the government presented the Chase bank cashier's check with the remitter listed as Nelly Idowu for $76,000 to Godwin Omene on February 8, 2019. Additionally, Mennitt testified that the bank was FDIC insured and that it issued checks at the time of the transfer.

Second, the following evidence is sufficient to show that Defendant knew the monetary transaction involved criminally derived property: Agent Coyle's testimony and Defendant's interview wherein she stated that the $100,000 deposited in her account by Adesotu was not his and that she did not know Godwin Omene but was told to send the money to him; Adesotu's testimony that Defendant asked him to help her move money in January 2019 and that he subsequently received two transfers from J.S. for $20,000 and $225,000 in February 2019; Adesotu's testimony that after the transfer, he went to Defendant's home and spoke with Defendant and her brother, Wilson-Metus; Adesotu's testimony that Defendant directed him to send $100,000 to her account.

Third, evidence of the cashier's check withdrawn from Nelly Idowu's Chase account in the amount of $76,000 to Godwin Omene is sufficient to support that the property at issue was greater than $10,000.

As discussed above, to prove the Defendant guilty of the fourth element, the government must prove beyond a reasonable doubt that the property was derived from wire fraud.

Mennitt testified that the $76,000 withdrawal for the cashier's check from Defendant's account was from the proceeds of the $100,00 deposit made in her account from Adesotu because there were not sufficient funds in the account for the withdrawal prior to the deposit. Further, in the video recording and transcript of Defendant's interview with Agent Coyle, Defendant states that the $76,000 check was from the $100,000 deposit from Adesotu.

The government has presented sufficient evidence to sustain a conviction under the fourth element. First, the parties' stipulated that J.S. sent money to Pea Network Technology on February 5, 2019, at the direction of "Brent Jason Chandler" as part of that person's scheme to obtain J.S.'s money through fraud. Second, the parties' stipulated that when J.S. sent money to

Pea Network Technology it was because she had been convinced by Chandler to do so as part of a scheme to obtain money through fraud. Third, the parties' stipulated and the government presented evidence that the $225,000 transaction from J.S. to Pea Network Technology was sent via interstate wire. Fourth, the parties' stipulated that the scheme obtained money through fraud.

Finally, the government presented evidence that the transaction occurred in the United States by presenting evidence by testimony of Mennitt to that effect and through bank records showing the relevant deposits and withdrawals occurred in the United States.

Viewed in the light most favorable to the government, the Court finds the government has presented sufficient evidence to sustain convictions for Counts 1, 6, and 8. The Court will therefore deny Defendant's Motion for Acquittal.

## IV. CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Judgment of Acquittal is DENIED.

DATED this 26th day of October, 2023.

BY THE COURT:

Ted Stewart
United States District Judge